Good morning, Your Honors. Mark Wilkinson on behalf of the appellant. I'm Becky Joseph. So as the Court is aware, this is an employment case arising under Title VII and Michigan's Elliott Larson Civil Rights Act, which traveled with the case when the case was filed in Michigan and transferred to the District of Minnesota. We've got two claims here. We've got a discrimination claim and a retaliation claim. And the lower court granted summary judgment to the defendant on the retaliation claim by concluding that none of Becky Joseph's complaints included allegations that her supervisors were engaged in sex discrimination. The Court found that Becky Joseph did not engage in protected activity under the statutes. And that's simply not true, as a matter of fact. She complained verbally, she complained in writing, and the company knew that she complained. They admitted that she had complained about sex discrimination. Her verbal complaints included her February 23 telephone call to the defendant's director of operations, Maddie Malloy. And she tells her, point blank, I'm being treated differently because I'm a female. That is protected activity by any measure. She also has a telephone call with the superintendent, Brent Palmer. She tells Brent Palmer that one of her co-workers, Gary Rainey, is treating her differently because I'm a female. She tells Brent Palmer that Gary Rainey has negative attitudes about females in the workplace. That Gary Rainey believes there's women's work and men's work. That is protected activity under the statute. But correct me if I'm wrong here. My recollection is that by the end of January, the appellant sent a message that basically retracted any statements to that effect and said everything was going well. If I'm remembering correctly, she said, I was wrong. How does that play into your ... How would you address those facts? You can't retract protected activity. That happened, 100%. She sent that email, but she sent it because she wanted to keep her job. She saw the writing on the wall. She saw that it didn't land well with the construction company. But you cannot, as a matter of law, you cannot retract protected activity. It either happened or it didn't. It stays there. She 100% engaged in protected activity. Even if that happened and you can retract it, I don't think you can, but let's say it happened. We've got her telephone call on February 23. That is protected activity after her call or after her retraction of her protected activity. We've got her written protected activity. She sends an email on February 24 to Maddie Malloy. The men are always right in the eyes of the company. I stand up to their discrimination and you're ready to send me home. She used the word discrimination in writing, in an email, to the company. That's protected activity. Counsel, with regard to the discrimination claim as opposed to the retaliation claim, what I'm waiting to hear from you is what evidence Ms. Joseph had other than her own accusations or speculation or characterization that there was sex to tie the defendant's actions to sex discrimination. She is the only female on the construction site. She's the only woman there. She's got Gary Rainey telling her, hey, there's women's work and there's men's work. The men's work is more manly. The women's work is less physical. She's treated differently than the men. The minute she complains, she's thrown off the construction site. The men are not. The men are allowed to continue working. Coming back to the retaliation claim. Well, before you leave the discrimination claim, what's the adverse employment action? Well, there are several. So, she's threatened with termination. She's immediately removed from the job site. She's isolated on the road, away from her coworkers. She's not gaining any experience. Everybody knows she's marched out of the workplace, thrown off the job site, kind of marked as a compulsive complainer. She's got her credit card canceled and she's got her job duties changed, and that's the big one. She was employed as an inventory specialist. That's what she was hired to do. That's a way better job than installer. Thomas Grace asserts they have no job title called an inventory specialist, and there doesn't seem to be, in the record, any place where such a position actually has been identified and what its job duties encompass. Have I missed it? You have. Okay. Where is it? Joint Appendix 752. There is Thomas Grace's inventory specialist job description. Ryan Scowl testified they do, in fact, have an inventory specialist position. Becky Joseph testified in her conversations with Brent Palmer. I'm sorry, Nathan Klump, when she's getting hired for the job, this is the job I'm working as, as an inventory specialist. There's emails to that effect between Ms. Joseph and Mr. Klump confirming her understanding that she's going to be working as an inventory specialist. This brings up, I think, a lot of what was animating the decision below as well. They say they don't have an inventory specialist position. We've got evidence that they do. That's a question of fact that a jury's got to decide. We don't get to just take the company's word for it that they don't have an inventory specialist. Coming back to the retaliation claim. Sorry to keep you on the discrimination claim, but it's my recollection that the appellant was hired. She wasn't hired for a particular workplace, for example, a particular site, a particular construction site. She was hired to work nationally. Is that correct? Correct. That is correct. If that's the case, to the extent that she was moved to other locations, could that still be considered as an adverse employment action? It can. Under Muldrow, it can't. Again, the standard is way different than when we started a couple years ago under Title VII. Now we've just got to show some harm. Having to work under a new supervisor that was already hostile, already going to lay a paper trail on her, had described her as a liability, transferring her to work under this guy, that's just a Muldrow. She also lost money with the transfer. If she would have had to travel to Connecticut from the Las Vegas area, she would have lost money on the transfer. There's a different rate for travel, so she would have been paid less. It's not whether the harm is significant. It's not whether it's a big deal. It's some harm. Getting paid less is some harm. Wouldn't the same be true of being placed on administrative leave even with pay? It would. It would. When you're marched out of the workplace, given the badge of compulsive complainer, having your credit card canceled or marked for cancellation, that is some harm. You're not getting any experience. You're stuck on the road away from your co-workers. That certainly qualifies as some harm as the Supreme Court has now articulated it under Muldrow. Coming back to the retaliation claim, we've got direct evidence of retaliation. We've got Maddie Malloy's February 23 email. The moment that Becky Joseph raised discrimination, they sent an email within minutes after a telephone conversation with Maddie Malloy. We need to terminate her. That is a smoking gun, Your Honors. You don't see this very often in employment cases. That stark of an admission and it leaps off the page. We need to terminate her. There's no ambiguity here. Nobody's got to make any kind of inference about what the intent was. The intent was to fire and it clearly shows that they held it against her because she complained about sex discrimination. I can reserve the rest for rebuttal. All right. If you'll do so. We'll hear from counsel for the affiliate. Good morning, Your Honors. My name is Paul Major and I represent the appellee, Thomas Rosenthal. We've reported a case retracted her concerns. She initially thought he was somebody she didn't want to work with and then realized that oh, I've just got to get to know him a little bit essentially and they started working well together. So, uh, counsel also argues that the reason for that later email is because she saw that it didn't land well. There's no evidence on the record that that's the reason for why she sent the email and there was nothing that kind of prompted and it was out of the blue her own decision to send that email. Additionally, counsel talks about the existence of direct evidence with regards to internal emails. But what he's talking about is the very initial reaction of somebody who doesn't typically handle HR issues while the individual who typically handles them is out of the country. And so her initial reaction is this is a problem because you have consistent complaints and issues of personality conflicts between this new employee. She then talks with the CFO who primarily handles HR issues, gets clarification, and there's no adverse action taken against the appellant, Miss Joseph. She was placed on paid leave, which is pretty standard in investigations if you're having major personality conflicts, especially ones like this situation where she called into work the next day because she was so concerned about having to work with this individual. So there was going to be an issue on site if they were all on site. And so Thomas Grace made the very understandable business decision to place the newer, lower-level employee on paid leave instead of the two supervisors who were in charge of both the day and the night shift for the role. That's a reasonable response in the circumstance. And counsel, even if it's a reasonable response, would you agree that after Muldrow that placing someone on administrative leave could be an adverse employment action? There may be circumstances in which that could be true post-Muldrow, but this is not one of those circumstances. They placed her on leave for about a week and a half or two weeks. I'm a little fuzzy on doing the math with the shorter number of days in February, but she was placed on leave February 24th. The investigation concluded on March 6th. As Maddie Molloy testified, the investigation didn't conclude until March 6th, and so it was a very short period of time, and it was reasonable in terms of the need to conduct an investigation along with balancing the business needs. And so there cannot be a bright-line rule that you cannot place someone on paid administrative leave, or you're going to make it very difficult for businesses to figure out exactly what they're supposed to do in this circumstance. Either they're forced to place everyone on paid administrative leave, which wouldn't necessarily, apologies, which wouldn't change the fact that you could still make an argument if you're an employee that that was still an adverse action as to you, for all of the same reasons that the counsel has argued here, because you still arguably are doing something a little different than what you intended. So you wouldn't be able to, so even that response wouldn't necessarily be an adverse action.      Or you have to leave everyone on the job site while you're doing an investigation, and that's going to make things much more difficult, both to get an objective investigation, where you're going to have more rumors floating around with the individuals involved, as well as focusing on the actual work that Thomas Grace was there to perform for Target in getting this store set up. So I don't disagree that there could be circumstances, and I believe the case law reflects there could be circumstances, but this doesn't come close to one of those circumstances. With regards to the discrimination claim, again, counsel is talking about, at the very beginning, about comments that Rainey made, but there's no tie between Rainey and any decision related to any type of even potential adverse employment action. She's not even alleging her job duties changed until several weeks into the SPARKS project, not the time Rainey was the supervisor, so those comments are completely irrelevant to establishing any of the elements necessary for a discrimination claim. Then counsel talks about that there was... Let's talk about that just a little bit. So Ms. Joseph alleges that she was changed from a lead installer, or she was changed from being an inventory specialist to a lead installer, and I think your response is, well, her employment contract says she's a lead installer, and so that's that. But couldn't someone's job description be changed for a particular job? I mean, are you saying, like, within a particular... I think you're saying once a lead installer, always a lead installer. I'm not sure that that's necessarily true. Does your client give a new employment contract every time someone is giving different duties? Not to my knowledge, but I don't think that the type of duties that she's talking about would be something that falls under a lead installer in the way that Thomas Grace has the position. I think in addition to the employment contract, though, the handbook also discusses kind of a 90-day training promotionary period, and so it's expected that she'd be learning a range of different duties during the time. And additionally, the claim that she was going to be moved to a different shift, that was what happened right when the new supervisor came on the day, she didn't even give it a chance to see what was going to happen, what she was learning, would she be going back to doing the duties that she thought that she was supposed to be doing. And then finally, the transfer that was offered out to Connecticut was also intended to be a transfer where they thought the role and the duties that she would be doing on that particular site would also more align with the inventory-type duties that she was hoping to do and what was her goal, because those were the type of duties that she enjoyed or that was what she wanted to do,  So the argument that termination was threatened, again, I'll come back to this. There's no evidence of this. If you read the testimony that's cited to it, the basis is an initial conversation that Maddie Malloy has with Ms. Joseph that she's going to be placed on leave. Initially, Maddie Malloy thinks it's not supposed to be paid. She discusses that with the CFO, immediately calls Ms. Joseph back and says, right, it's supposed to be paid, and if you want to stay in Sparks instead of coming back to Michigan, that's perfectly fine, and they continued to pay her, which also addresses the next argument the counsel made, that she was isolated on the road. She had the decision or the option to go back to Michigan, or she could stay where she was. She chose to stay where she was. Her room and board were still being paid for, and she was still being paid her typical wage, as if she was on the site. So there's no adverse employment action there. And then the counsel also argued, makes reference to the new supervisor she would have had on the job site in Connecticut. At the time that Ms. Joseph resigned from her position, she did not even know who the new supervisor would be, so there can't be an adverse employment action when she's quitting, especially under a constructive discharge analysis, when she doesn't even yet have the information that she's making her argument based upon. So her decision at the time that she chose to resign cannot have been based upon the fact that she thought her new supervisor was going to be out to get her when she didn't know who that was. From the very beginning, from her very first day on the job site in Las Vegas, she's taken a negative view of any action that has been taken. She immediately thinks there must be something suspect going on, and yet when she actually spends time with Rainey and gets to know him better, it doesn't mean she agrees with some of the things he said, but she realizes that, yeah, okay, he's not out to get her. They just have a little bit of a different worldview, but they can get along and work on the site. So you think your point is that she retracted her complaints? I think that is part of it, absolutely, that she retracted her complaints. In the email? Yes, in the email. That I was wrong? Yes. Do you have a case or have you found a case where the court has dealt with that situation where there were, as here, written complaints of discrimination here based on gender, and then the complaint is withdrawn, or there's an admission, a similar admission in similar form that the complainant was wrong? I'm just struggling a little bit with what we do with that, whether that retraction, so to speak, is just a bit of evidence that must be weighed with everything else, or as a matter of law, does it then negative the complaints that came before? So I don't have a case that I'm aware of that addressed that specific circumstance, Your Honor, but I think the right approach is to evaluate in the context of what happened. So she's initially concerned, let's say we should say that it's about sex discrimination with Rainey. When she then comes back later and essentially says, no, that wasn't an issue, she's providing the information with regards to, she's reassessing her initial impression, and so there isn't, and I think more importantly, there isn't then a tie between what he allegedly said to her and what, and her ultimately quitting her employment. He's not someone who was involved in the decision, she isn't, that wasn't even the basis of her complaint that led to the investigation. So I think both the retraction is strong evidence that she, her initial impression was incorrect and she's acknowledging that, and therefore, unless you can tie an adverse employment action to the initial complaint, which was two months prior to the end of the investigation where they offered her the transfer, you don't even have temporal proximity between her initial complaint and the adverse, the alleged adverse employment action that happened two months later, even more so when that was her own decision to quit her employment rather than accept the transfer that was offered. And with regards to the transfer itself being an adverse employment action, certainly there are cases or circumstances in which a transfer could be an adverse employment action, but her job, quite explicitly, was a traveling position where she would be going to different target stores that were being constructed and set up that Thomas Grace was involved in, and so it would not have been uncommon at all for her to be traveling across the country. She went from her home to Stillwater just down the road for training at Thomas Grace's facility, then she went to Las Vegas, then she went to Sparks, which is near Reno, which is, I remember right, about three or four hours away if you're driving. And as we also know, Target is stores across the country, so it would not, in the circumstances here, there can be no reasonable argument that transferring her to a different position when that was a known aspect of her job and laid out both in the, not calling it a contract, but the employment description as well as in Thomas Grace's handbook in terms of the type of position that she had. And then counsel also makes an argument with regards to she would have lost money making the transfer because travel pay is different. That would be true any time she'd be transferring a job site because the travel pay is a slightly different rate. But there's, that lowers the standard to almost nothing. If something that is a typical part of her job would result in a few dollars less an hour for that plane flight that she's taking from Sparks or probably the Reno Airport all the way out to Connecticut. Unless your honors have any additional questions, I urge you to affirm the district court's grant of summary judgment. And thank you for your time this morning. Thank you, counsel. Counsel, we'll hear your rebuttal argument.  So, coming back to this idea of retracted protected activity, I don't think that's possible. It's a bell that gets rung and once it's rung, it is rung. It cannot be retracted. Well, one reason I got into that is because I got and asked, did she, did the appellant here present, send an email, a writing of any kind that identified discriminatory conduct on the workplace other than the words that you would fairly interpret as only characterization? For example, it's one thing to say that someone is demeaning. It's another to identify exactly how that person has been demeaning. So, I'm asking, did she submit anything that gave examples of what she felt she was dealing with? Her February 24 email to Maddie Malloy says, the men are always right in the eyes of the company. I stand up to their discrimination and you're ready to send me home. There's gender in that email. The men are always right and the word discrimination is in that email. But do you think that's enough? Absolutely. I'm not hearing an example given. For example, he only allows me to do X kind of work as opposed to the work that's assigned to the men, which is X.  I mean, it sounds like we're just characterizing instead of giving factual examples. I don't think you're going to find an email like that. There is deposition and testimony like that. And this gets into the last point I want to make here is, I'm going to go down, write an opinion and the court's going to cite a summary judgment standard. It's a standard so familiar that we don't even think about it anymore. But we're not allowed to weigh evidence at summary judgments. We've got deposition testimony and we've got documents. We can't elevate documentary evidence over Becky Joseph's deposition testimony. She explained why she apologized about her initial complaint. She didn't want to lose her job and that's reasonable. If you think about a woman on a construction site complaining about how the men are mistreating her, you think about the cold shoulder, the cold reaction she got. What was her deposition testimony in that regard? That she didn't feel she had any need to apologize but she did so just to move on, to put it behind her. She's a new employee, a new female employee in a male-dominated industry that she wanted to not make waves. That's a paraphrase but that's what her deposition testimony was. Well, I guess I'm asking, going further back, her impressions on the job site, in her deposition testimony, did she identify how she was treated differently? Not her characterization of it but how was she treated differently? She wasn't allowed to do the job she was hired for. They made her work as an installer instead of letting her do the better job, the inventory specialist. And the testimony relating to Gary Rainey was, this is men's work. There's men's work and women's work. You need to go do the women's work. Thank you.